May it please the Court, my name is Corinne Chandler. I represent the appellant Margueritte Kibel. My client, Ms. Kibel, suffers from MS. The issue in this case is whether she was disabled under her own light occupation. This appeal raises two issues. First, whether the District Court erred in finding no material difference between a sedentary and light occupation. The second was whether it was erred to refuse to admit the declaration of Dr. Anderson. Instead, the District Court adopted a circumstantial inference without a basis for doing so, to find that Dr. Anderson found no evidence of significant impairment. The declaration directly rebutted that inference. In Silver v. Executive Carr, this Court held that it was appropriate to reverse for clear error where the District Court's opinion did not reflect a 1. clear examination of the record and 2. whether there was a disregard of significant evidence. There is both in this case. Every physician who provided a disability assessment said that Ms. Kibel was only capable of performing a sedentary job, but her job was a light job. Which leads us to issue number one. This is not a case where we are arguing whether the occupation was sedentary or light, nor is it a case where the material duties of her occupation were disputed. Rather, the issue in this case is whether the District Court erred in holding that the only differences between a light occupation and a sedentary occupation were the lifting requirements. We know that this isn't true. There are material differences between the two exertional strength occupations. A light occupation requires walking to a significant degree, up to six hours a day, and this is consistent with her job description, stating that 65% of her duties were in outside sales. In fact, the precipitating events to her disability were two falls which occurred while working for the bank outside of the bank. She had to attend civic and community events. Aetna assessed her job under Department of Labor criteria. It determined she had a light occupation. Now, Aetna argues that the court reviewed the record and determined that the differences were inconsequential, and this is the clear error. Let me ask you this, if I may. I understand that in order for her to get coverage for the long-term disability, she needs to show that she has been disabled within the meaning of the policy by February 20, 2013. Is that the right date for that? Either the 20th or the 22nd. But basically late February 2013. That's correct. Leaving to one side the declaration of Dr. Anderson that wasn't admitted, at least for the moment, what evidence do we have that she was disabled within the meaning of the policy by that February date? First, there is at the time she submitted her claim, Dr. Faramundian, her attending physician, completed an attending physician statement that stated that she could only perform a sedentary occupation. He said further restrictions were climate control and reduction of stress. Climate control, the parties have really not focused on that, but when her job requires outside sales activities 65% of the time and heat exacerbates her condition, then she cannot do that job. So there's Dr. Faramundian. There is, I believe that Aetna's physician, Dr. Cohan, was presented with that question, and he was asked what level of work can she do, heavy, medium, light, sedentary? And he said sedentary. Aetna's physician said sedentary. And then we also have contemporaneous medical records, which consistently document fatigue. Now, she has falls in 2011. That's correct. And at some point she quits work on the advice of a doctor. At what date was that, December? No, I believe that she continued working until February. Well, no, I understand she finally quits in February. No, no. Excuse me, Your Honor. She went out on leave in February 2013. At that time, Dr. Anderson's records documented severe fatigue. But I thought she'd quit work temporarily earlier than that for a brief period. I thought, like, it was in December of 2012 or maybe 2011. In February 2012, she went out until March, and then she returned to work for about 15 days, 15 working days from March to April. And then she went out again in April. Now, in November or December, she tried to return to work. That's the date I'm looking at. That's 2012. 2012. So all of these dates are prior to the late February 2013 date, at which point she has to be disabled. That's correct. Okay. The district court erred in finding that there was no material difference between a light and sedentary occupation. And if I could just quote from the district court's opinion, it stated, These findings that substantiated impairment, which were only optical in nature, and that isn't true, do not indicate that Ms. Kibel was incapable of light work, which only differs from sedentary work by requiring exertion equivalent to 10 pounds of force more frequently and an upward capacity of 20 pounds of exertion. So basically the court is saying the only difference between a light and a sedentary job are the lifting requirements. But this is not true. That is patently wrong. There are material differences between a light and sedentary work. Light work requires walking or standing up to six hours a day, a physical requirement that could not be performed because of Ms. Kibel's fatigue. And we know that from her job description, this was consistent with that classification. Aetna's classification of light work was based upon Department of Labor criteria, the DOT job description. The explanatory trailer defines light work based upon the DOT job description has an explanatory trailer which defines sedentary medium light, and that is based upon Social Security regulations. And I would suggest that to the extent that this court is reviewing the district court's interpretation of sedentary versus light based upon that Department of Labor criteria, this court's review would be that of DeNovo. Now Aetna argues that the trial court appropriately deferred to the opinions of the treating physician. This is not true. There is no disability assessment in the record by Dr. Anderson. The authority cited by Aetna in the trial court where deference was provided to a treating physician was one that treating physician provided an assessment of disability. In the record, this did not occur, at least by Dr. Anderson. But there were three disability assessments by physicians, and they all proved disability. As I just mentioned, Dr. Cohan from Aetna, Dr. Faramundian, and the independent medical examiner, Dr. Fink. The district court disregarded them, stating a preference for the records of Dr. Anderson. However, in doing so, it drew an inference that was not substantiated by the records. And that leads me to issue number two, whether it was error to refuse to admit the declaration of Dr. Anderson. This case was tried down below based upon DeNovo review. Under that standard of review, the court is to evaluate the evidence and determine which is more likely or not to be true. On Keibel's side, she had her medical records, the attending physician statement by Dr. Faramundian, and the independent medical examination by Dr. Fink. The disability assessments all limited her to sedentary work. Aetna had its nurse review and the paper review by Dr. Cohan. Dr. Cohan's report supported disability because he also said she could only do sedentary work. The nurse review was of little credibility because she initially evaluated the case based upon the assumption that Ms. Keibel's job was a sedentary job. When the vocational report came back and said that it was a light occupation, she merely substituted the word light for sedentary in her assessment. There was no assessment, no evaluation of the additional duties that were required by that standard of occupation. Now, initially, the district court found ambiguity in the record regarding the history section of the MRIs, and he issued an order after hearing at trial. The MRIs, in fact, showed significant progression. In 2001, they showed two plaques in her brain. In 2012, before she went on disability, they showed 17 plaques, and it was characterized as moderate disease burden. The MRIs were not performed by Dr. Anderson, but two radiologists. The district court requested briefing and possible extrinsic evidence regarding the history section of the MRIs. Keibel offered the declaration of Susie Bash, one of the radiologists, outlining how she customarily filled in the history section of the MRIs. Her declaration was inconclusive. She could not remember what she had done in Ms. Keibel's case. The court then rejected the evidence it had invited and traced the history section of the MRIs to Dr. Anderson without a basis for doing so, and that is at Excerpts of Record, page 21, footnote 11. It attributed findings to Dr. Anderson which did not exist. He said that Dr. Anderson did not find significant impairment, and then he footnoted, he made a reference in the footnote regarding the history section of the MRIs. The district court stated that it then preferred the evidence of Dr. Anderson and that it could not ascertain that, quote, This error was twofold. There was no basis for tracing the history sections of the MRIs to Dr. Anderson, and there was no basis for the district court's conclusion that Dr. Anderson did not observe physical impairment. If I can interrupt for a moment. The district judge made a mistake. In his initial order, he thought that if she was disabled as of March 2014, her long-term disability benefits would run from that date, and he's later informed, no, no, she has to have been disabled by February 2013. How did that mistake creep in? I mean, this is a smart district judge. I mean, why is he not absolutely aware of when the disability has to begin? I am not sure, Your Honor. This plan has a kind of unusual provision, in my opinion. Most plans require you to be disabled on your last day of working and then you meet an elimination period. This plan provides that your coverage will continue if you are off work for up to a year or until you are terminated. And Ms. Keibel's coverage did not terminate until February 2013 because at that time the bank had been conducting a job search and it determined in February 2013 that it could not place her in a job with her physician's restrictions except for one job that paid like $10 an hour that was unsuitable. That would strike me almost as presumptive evidence that she wins, meaning she can't do her previous job. I agree, Your Honor. I think it's very persuasive. And I do wish to reserve some time, but I would just point out in conclusion that under OPEDA versus Northwest Mutual, it is appropriate to consider a declaration such as that we offered from Dr. Anderson because it is an explanation of a clinical term, mild fatigue. Thank you, Justice. Good morning, Your Honors. Matt Kleiner on behalf of the Appellee Aetna Life Insurance Company.  The judgment is supported by the District Court's factual findings and credibility determinations. Those factual findings and credibility determinations represent a logical, plausible, and permissible interpretation. I'm just puzzled by one thing that at the beginning maybe you can clear up. All these determinations of sedentary or whatever the next step is. Light. Light. Light. All those determinations, why is it that those determinations don't establish that she can't do her job? The classifications of sedentary versus light and there's other different types of occupations. The question in the plan is not whether it's light versus sedentary. It's whether or not she can do her own occupation. But if she can't do sedentary and can do light, doesn't that mean if she can't do more than light that she can't do the job? If the determination was that she couldn't do sedentary work, then that would be correct, that she wouldn't be able to do light work. And if she can only do light work? Then she would be able to perform the duties of her own occupation, which is classified as a light occupation. Classified by whom? When you look at what her occupation is under the DOT, it's a light classification. But if you look at what she actually does rather than some abstract classification, I'm not sure it describes accurately what she does because she's got a lot of work outside of the office. She travels a lot. She solicits business a lot. I'm not sure that coincides with the definition of light. I agree 100%. Well, then how can you say then if she can only do light that means she can do her job? I don't think that says that. The point is can she do her own occupation? That's right. And whether it's sedentary, whether it's light, you have to look at what her own specific requirements of her job are because these classifications are general and they don't apply exactly and fit everything. Which is my point, and I'm not sure you're disagreeing with me. Merely to say that she can do a light occupation doesn't mean she can do her prior occupation. Is that correct? Do you agree with me? I do agree with you, Your Honor, yes. And it doesn't seem like her kind of job would fit within the light category. Light has to do with how many hours a day can she stand or sit. I don't recall offhand what it is, but it's a very restricted category. And if she could only do light, it seems to me that she wouldn't be able to do the kind of work she did. The court here, in terms of responding to your question, I don't want to be categorized in terms of light versus sedentary because the court found that she could do her own occupation, not that she met the definitions of the DOT light occupation. Well, I know the court found that, but the question is, was the court right? And if the evidence before the company or the plan was that she could only do light, it would seem to me that that would dispose of the matter because the job that she actually did seems to me like it would require more than the capabilities that someone who could only do light work can do. The district court here looked at the specifics of her occupation and specifically her travel, her outside sales work, and came to the conclusion that based on the evidence provided, that there wasn't enough evidence to show that she satisfied her burden to show that she could not do her job. And when you look into the portion of the findings of fact that deal with the 2014 MRI, there's a discussion in there that talks about specifically the job requirements here requiring travel, the fact that she fell when she was with a client at a museum, and basically her requirement that she has to ambulate and to do the various requirements of her job. And the district court, in going through a detailed analysis of all the medical records, found that for the first time in 2014, which is after the plan expired, that her ability to ambulate and to travel and those various things were severely hampered by the numbness in her leg and all of that arose. But her two falls on the record took place in 2011. Isn't that right? That is correct. And also following that, she went to go see her treating physician, Dr. Anderson, and he basically noted that she was still a healthy individual. Well, healthy, that's a broad sort of encompassing definition. It puzzles me that her company basically terminates her on February 20, 2013, because it concludes that they can't find another job for her that's consistent with her limitations. Why is that itself not evidence that she can't do her prior occupation? Ultimately, I can't speak specifically to, you know, what the requirements of. . . I know that they found other jobs and it was a less paying job that was availability. So it goes based to more availability of positions than it does. . . Well, no, wait a minute. They're looking to replace her in the job that she is doing. They're looking for something else that she can do while working for the company, taking her out of the job that she has been doing, and the policy pays her in long-term disability benefits if she can't do the job that she's been doing. And the company itself has concluded that she can't. So isn't that evidence of disability that satisfies the terms of the policy? No, Your Honor. And I think we might be getting a little outside of the administrative record here, but my understanding is that she took a leave of absence. And during that leave, presumably, her company filled her position and has someone else in that position. When she comes back to work, that position may or may not have been even open. So the bank is basically saying, we'll try to find something else that would work for you based on your conditions. The only thing that they had available was a much lower paying job, which she did not want to take. Now, in December of 2012, she gets a doctor who says, you know, you really can't go back to work, and she moves in with her parents. Do you have that on the record? Do you have that in your head? Yes. Yes, Your Honor. And I have trouble looking at this record seeing that she wasn't disabled within the meaning of the policy. She is basically in and out of that work for a year before February 2013 because of her physical difficulties. And the doctor says on December 2012, you know, you shouldn't be working. She moves in with her parents. I don't get it. I mean, it seems to me that there's plenty of evidence that she just can't do the job. And the issue here is looking at the, you know, under the standard of review and reviewing the findings of fact of the district court whether or not there was a clearly erroneous and whether or not there is no other permissible interpretation of the facts of that issue. So, in other words, we have to look at the district courts. I understand that, and you're still in trouble. Right. And, Your Honor, you know, those points are in the record, but there's also points in the record where both Dr. Anderson and Dr. Farhan Mondian had wrote notes for her saying that she could go back to work, and she did try to go back to work. And then when she returns to work, she's reprimanded for a serious violation of bank policy when she gets back. She also was asked by the- She disputes whether or not she was actually in violation. I understand there was a reprimand, but she disputes whether, in fact, she violated the company policy. That's correct, but there is a reprimand in there. And there also are statements in the record where an Aetna representative spoke to her about her desire to go back to work, and she basically said, I'd like to go back to work, but I can't because I'm uncomfortable there. And so you have these other facts, which also lead to the other side of the coin here, which is that maybe she isn't not going back to work because of a disability, but it's because she's not comfortable there. She received a reprimand, and that was a place where she no longer wants to work. Counsel, I had a question for you about the treatment of her or the consideration of her depression. I believe the district court concluded that the depression was, I think, depression and not necessarily linked to her diagnosis. It seems to me that she at least introduced some evidence that her depression was due to her medical condition, and I was wondering if you could talk about how the district court addressed that argument that she made. Well, part of it, the district court talked about the fatigue in terms of depression versus MS, and ultimately the position that was being put forth in terms of her disability was that she has MS and she has fatigue as a result of it. And the district court came out and said, I can't say that the fatigue is a result of the MS versus the depression, which goes to the credibility of the determination that necessarily the fatigue isn't something that is contributing to her disability because it could be something that's a temporary inversion of the depression. I recall something in the record that she submitted a declaration or some sort of paperwork suggesting that, no, the reason why she was depressed was because of her MS and that I don't recall the district court addressing that declaration. Am I remembering that correctly? It was a personal statement that she submitted in conjunction with her appeal. And did the district court ever talk about that personal statement? The district court talked about her subjective complaints and talked about those in the context of all of her treating physician doctors and ultimately said, look, she's making these statements in terms of her subjective beliefs as to her ability to work. And when you look and you compare those to her treating physician's records who had been treating her since 2001, there's an inconsistency there. And so ultimately he found that the treating physician's records were more credible than the subjective complaints of the appellant. Right, but did he ever actually address her personal statement? Did he ever say, I've reviewed the personal statement and here's why I don't think it's credible? In his findings, in fact, I do not recall anywhere where he specifically refers to a personal statement. But like I said, he does refer to her subjective complaints. And he also talks about those subjective complaints in the context of Dr. Fink's independent medical examination, where he discredits the independent medical examination because a lot of that is based on her subjective complaints. And he then goes back again to Dr. Anderson's records to say that it's not consistent with what her treating physician is saying, even after the independent medical examination took place. If it could be shown that her depression was a product of her MS and that her fatigue caused maybe both by the depression and the MS directly prevents her from doing the job, but if it would take as a premise from my question that the depression is caused by the MS, does that then result in a disability? This is a version of Judge Owen's question. I'm not sure I'm 100 percent with the question. Let me state it as clearly as I can. Depression can come from many things. Let's assume for purposes of the question that the depression comes from, is caused by the MS. At that point, we have fatigue that is caused by the MS and the depression, but the MS is causing the depression, which means that the fatigue is entirely due to the MS. Now, what's that do to us if we think that the fatigue is sufficiently disabling she can't do her job? If you're assuming that the fatigue is disabling, which is a finding that contradicts what the district court did, because the district court concluded that the fatigue was not disabling and went going through the analysis that it was not a disabling function. If you assume that fatigue is disabling and that essentially whether it's coming from depression versus MS, ultimately that would, from my perspective, fall within the definition of disability. Well, and then I had a different question that was related, which is to say what happens if the depression is related to but not caused by the MS? Is depression itself a disease? And if it's disabling, is that disabling within the meaning of the policy? Depression can fall within the meaning of the plan. There are different requirements and limitations. I can't remember if this plan has a mental health limitation. Sometimes there's a cap on the amount of disability that would run from a mental health limitation, like a two-year cap, for example, as opposed to MS, which would have the two-year ONOC period and then until she retires. I get it. Thank you. Just moving briefly to the ‑‑ I know you've got about a half a minute left, but we'll give you a minute and a half. Okay. Thank you, Your Honor. Just moving very briefly to the question about the declaration of Dr. Anderson, whether or not that was ‑‑ the court properly exercised its discretion to exclude that declaration. Ultimately, this arose in a question as to whether or not or where the information in the history on the MRIs came from. And this declaration kind of came in almost through the back door, so to speak, because it addressed the definition of what is mild fatigue. Now, it didn't go through what is and what's the information that's within the history sections of the MRIs. So on that basis alone, it wasn't responsive to the court's question or inquiry. The appellant is asserting that it's undoing an ambiguity in the complaint or providing a clinical definition, and it defines medical or mild fatigue. But I submit, one, that it's harmless because they had already submitted a bunch of articles that deal with fatigue, so the judge was already aware of fatigue and how it relates to MS. But in addition to that, you have to look back to the fact that this declaration, if it's allowed and admitted, would be inconsistent with the findings of Dr. Anderson from 2001 where he does mention that she has mild fatigue, and she worked for 10 years after that point, and there's other places in the record where there's references to mild fatigue. So if you assume that mild fatigue is disabling as a matter of fact, then that means that she should have been disabled in 2001, but yet the evidence directly contradicts that. So unless there are any further questions, I will submit. Thank you. Thank you, Your Honors. I think I have about one minute. Counsel referred to literature we submitted in the record which addresses Your Honor's question regarding MS fatigue and depression, and this literature states, these data confirm that fatigue results in disability, but the cognitive and psychological dimensions of fatigue remain independent. Fatigue also causes depression and a lower quality of life. And that is that excerpt of Record 939. And in fact, there was evidence of her depression. The medical notes document that she was crying and distraught. During her examinations, she was prescribed Vybrid, which is for fatigue and depression or anxiety. And these are subjective complaints, but that does not mean that they can be disregarded by Aetna or the court without a reason to doubt the credibility of the claimant. And that is the subject of this court's recent decision in Demer versus IBM. And I'd also like to point out that as far as a job or whether the bank was dissatisfied with her, in the termination paperwork the bank stated that she was eligible for rehire. And this was somebody who wanted to work and work for the bank. She tried to return to work twice and was unable to do so. Thank you. Thank you.
judges: Reinhardt, W. Fletcher, Owens